Jay T. Jambeck (SBN #226018)
Mandy Leigh (SBN #225748)
Nathan Sullivan (SBN # 299704)
LEIGH LAW GROUP, P.C.
870 Market St., Suite 1157
San Francisco, CA 94102
Office: (415) 399-9155
Fax: (415) 795-3733
jjambeck@leighlawgroup.com

*Attorneys for Plaintiff*
LISA ALBERTSON

### IN THE UNITED STATES DISTRICT COURT FOR
### THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LISA ALBERTSON,<br><br>        Plaintiff,<br>    vs.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>        Defendant. | **Case No.**<br><br>**COMPLAINT FOR:**<br><br>1. **VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12132);**<br><br>2. **VIOLATION OF SECTION 504 OF THE REHABILITATION ACT (29 U.S.C. § 701, *et seq.*)**<br><br>JURY TRIAL DEMANDED. |

Plaintiff alleges as follows:

**THE PARTIES**

1. Plaintiff, LISA ALBERTSON, ("Plaintiff") is a resident of Sonoma County, California.

2. Defendant, THE REGENTS OF THE UNIVERSITY OF CALIFORNIA ("REGENTS" or "Defendant") is a corporation established by Article IX, Sec. 9 of the California Constitution and is a statewide governmental entity employing more than fifteen employees and is located throughout the State of California.

3. This Court has jurisdiction over the subject matter for the claims in this complaint pursuant to 28 U.S.C. § 1331. This action arises under the laws of the United States, Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq*. Plaintiff has exhausted the requisite administrative remedies.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because the Northern District of California is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred and in which the parties to this litigation reside.

## GENERAL ALLEGATIONS

5. Plaintiff matriculated at the University of California, Berkeley ("UC Berkeley") in the Fall of 2009 in its undergraduate program. She was majoring in Social Welfare and minoring in Public Policy. UC Berkeley is one of the institutions of the University of California system and is therefore governed by Defendant and its agents.

6. Immediately upon her enrollment, Plaintiff registered with Defendant's Disabled Students Program ("DSP") and was found eligible for school-related services and accommodations based on her disabilities. These disabilities included: AIDS, chronic back pain, mobility issues, diarrhea/nausea related to AIDS/medications, progressive loss of hearing, and arthritis. She later developed further disabilities that required additional accommodations as shall be described below.

7. As a result of her disabilities, between 2009 and 2014, Plaintiff received

accommodations and services from Defendant's which included: the use of a note taker; the use of furniture to ensure access to classes, labs, and/or exams such as a detached table and chair; the opportunity to alternate between sitting and standing during the class period; time-and-one-half all her classes to complete exams and quizzes; arrangements to take a makeup exam if her disability prevented her from taking the exam at the scheduled time; frequent rest-breaks during exams; time for these rest-breaks has been included in the total calculation for extended exam time; the use of an audio recorder; the use of computer for quizzes/exams; and excusals for missing class due to having to obtain medical treatment.

8.  The evidence demonstrates that Plaintiff was able to be a successful student in all classes in which she received appropriate and needed accommodations, despite the clear academic challenges she had.

9.  During her enrollment, Plaintiff was diligent in communicating with her professors and academic advisors to keep them informed of the how her disabilities negatively impacted her academic performances and to develop plans on ways to meet her course requirements.

10. On August 6, 2012, Plaintiff was driving across the Richmond Bridge when the Chevron gas refinery, which is located next to the bridge, exploded. As a result, Plaintiff was exposed to noxious and dangerous gas chemicals and began to experience serious health conditions. These conditions included a severe hindrance to her breathing, asthma for which Plaintiff required nebulizers and inhalers, a development of peripheral neuropathy in her hands, migraines, and a loss of focus. Given these conditions and side effects of medications related to conditions, Plaintiff required note-taking services so that she could maintain focus in class and have the sufficient energy level to do so.

11. As a result of these incidences, Plaintiff requested note-taking services in the Fall of 2012. Given her disabilities, DSP provided this service to her based upon requested medical documentation from her medical provider.

12. Per its guidelines, UC Berkeley provides note-taking services to students with disabilities by finding student volunteers in the class who provide copies of his or her notes to the disabled student. Volunteers then received a monetary stipend at the end of the year for their work. UC Berkeley has also stated that this system fails to produce a note-taker in only approximately 5% of cases and that LiveScribe pens and/or digital recorders shall be provided as an alternative if such a situation were to occur.

13. At the beginning of the Fall 2012 semester, Plaintiff was denied continuing financial aid because of her alleged lack of Satisfactory Academic Progress ("SAP"). Plaintiff appealed this denial given the extenuating circumstance described above. Plaintiff's appeal was approved and she was granted continued financial aid for the semester.

14. In the Spring 2013, Plaintiff took two classes for 7 units: Anthro 115-Medical Anthropology and UGIS 112-Women and Disability. At the end of this semester, Plaintiff had to take incompletes in these courses given that she had to undergo medical procedures due to exposure to Hepatitis A outbreak due to organic frozen berry product purchased at Costco. During this semester, Plaintiff also diagnosed with Diabetes 2. Both of these health issues required several doctors' visits and treatments, therefore making class attendance and participation unfeasible.

15. Plaintiff was also denied financial aid during the Spring 2013 Semester, again due to an alleged lack of SAP. Plaintiff appealed this decision given that she had undergone many medical procedures due to a potential Hepatitis A outbreak and being diagnosed with Diabetes 2. Plaintiff's appeal was approved and she was granted continued financial aid for the semester.

16. For the Fall 2013 Semester, Plaintiff enrolled in three classes: Social Welfare 250M, Social Welfare 97-Field Study, and Introduction to Public Policy Analysis PP101-Negotiations. Per the DSP approved disability accommodations, Albertson was to receive note-taking services and use of an audio recording device, among other accommodations, for all classes. However, the

disability accommodation letters for both classes did not indicate whether an audio recording device would be used as an alternate to the provided note-taking service.

17. At the start of the Fall 2013 semester, Plaintiff was again provided financial aid despite allegedly not making SAP given that DSP had failed to provide her with accommodations for her to successfully complete coursework and she had been preliminarily diagnosed with cancer. Recent testing has indicated that Plaintiff does not have cancer as of the date of this complaint.

18. In order to maintain eligibility, DSP mandated that Plaintiff was to: (1) complete six units in the Fall 2013 semester; (2) maintain a cumulative or semester GPA of 2.0, and (3) not attempt to withdraw from the Fall 2013 semester.

19. The Fall 2013 semester began on August 29, 2013. From the very start of the semester, Defendant was unable to obtain a note-taker for Plaintiff's Social Welfare 250M class despite attempts to do so. During the course of this semester, Plaintiff contacted then-DPS director, Paul Hippolitus, and then-Disability Specialist, Haydee Lindren, to inquire about the note-taking service. DPS told Plaintiff that there were no student volunteers available to take notes in her Social Welfare 250M class.

20. Plaintiff also only received notes in her Public Policy Analysis PP101 class for 3 out of 14 Classes, which is a wholly inadequate amount given Plaintiff's clear need for note-taking services. Plaintiff did not require note-taking services in her Social Welfare 97-Field Study class.

21. In response to the lack of volunteer note-takers, Defendant provided Plaintiff with a technology grant for an iPad to be used as a light weight device for both recording and access to online materials. Plaintiff was originally told by DSP staff that she could apply for the technology grant to be used for purchase of an iPad but after applying for the grant, was denied. Plaintiff then emailed Paul Hippolitus explaining the lack of note-takers and need for iPad device for her courses. Paul Hippolitus then reversed the denial and approved the grant, also acknowledging the note-taking issue. No one in the DSP office indicated in Plaintiff's disability accommodation letter that

such a device would be provided in lieu of the notetaking service. For Plaintiff's Social Welfare 250M class, it was critical that she incorporate notes from the class lectures into the assignments and exams due to the fact that a large portion of the lectures and student sharing was to be referenced in written journals/assignments/final exam. As such, the lack of notes in this course presented a huge barrier to Plaintiff being a successful student.

22. Given that she had failed to receive appropriate accommodations during this semester, Plaintiff asked for her Professors in her classes to give her "Incomplete" grades. Her Professors granted these requests.

23. At the start of the 2014 semester, Plaintiff was again denied financial aid given that she had only completed one unit from the Fall 2013 semester and had not completed classes in which she had "Incomplete" grades, which had been a condition for continued financial aid during the 2012-2013 school year. Defendant also noted that Plaintiff had failed to complete 6 units, a condition to which she had agreed to in past semesters in order in continue receiving financial aid.

24. Defendant's financial aid administrators then presented the following options to Plaintiff: (a) drop all her courses (which then incur a mandatory one-year withdrawal from the University, and Plaintiff would then have to reapply for admission); or (b) Ask her professors to extend her incompletes from previous courses, and complete all her courses continue with the 2014 spring semester, despite having not received appropriate accommodations the previous semester. Plaintiff decided to continue to be enrolled at the University.

25. On March 20, 2014, Plaintiff appealed this decision to the University's Financial Aide Office's SAP Committee ("SAP Committee"). Drafting this appeal required extensive time and effort for Plaintiff to complete given her disabilities. In support of her appeal, Plaintiff outlined the fact that she had not received appropriate note-taking accommodations during Fall 2013 semester and still had to attend many medical appointments and life-threatening procedures due to a cancer scare. Furthermore, Plaintiff noted the progress she was making in the three classes in

which she had prior incompletes, the fact that two of her professors had granted extensions for her to complete the courses, that one of the classes had been completed and just required the professor to grade several final assignments, and that she had "A" grades in all the classes. Finally, Plaintiff explained that her professors and counselors/advisors had informed her that she was on track to graduate that year and expressed confidence that she would be able to complete her required course work in order to do so. The SAP Committee, however, denied this appeal.

26. For the beginning of the Spring 2014 semester, Plaintiff reenrolled in Public Policy Analysis PP101-Legislative Lobbying and 3 other classes. Plaintiff dropped 2 classes before the drop deadline, leaving her with PP101-Legislative Lobbying and Social Welfare 97-Field Study for a total of 6 units.[1] Plaintiff only required note-taking accommodation for the PP101 course. Plaintiff did not receive note-taking accommodation for PP101 until approximately three weeks left in the semester, which required her to request an incomplete in the course. Plaintiff's professors were able to assign Ms. Albertson a grade of "Incomplete" due to the fact that her "work in a course has been of passing quality, but is incomplete for reasons beyond her control."

27. Her disability accommodation letters again provided her note-taking services and audio recording device, but again failed to state that audio recording devices could be used as an alternative to note-taking services.

28. The evidence demonstrates that Defendant was unable to secure a volunteer note-taker for Plaintiff's class and even attempted to have the course's Professor provide his notes.

29. Plaintiff and DSP also engaged in many conversations regarding this service in the class during the semester.

30. On approximately March 6, 2014, DSP wrote to Plaintiff and purported to offer

---

[1] It is a common practice for students at the University to enroll in more classes than they plan on taking in order to figure out which ones are best suited to their likings and/or needs. When a student does not want to take the course they will drop them before the University's drop deadline.

7
COMPLAINT
(Case No.)

her a recording device in lieu of the note-taking service. Plaintiff stated that she already had a recording device, a LiveScribe pen, did not need another one, and was furthermore an ineffective alternative to the note-taking service she had been granted. Plaintiff explained that she had attempted to use a recording device the previous semester when note-taking services were not provided to her, but her disabilities prevented her from being able to process the audio recordings. Because of the Chevron oil refinery explosion, Plaintiff suffered from migraines, asthma, and chronic pain. In order to combat these symptoms, Plaintiff had to take numerous medications and other services (such as inhalers, pain medications, and nebulizers) which caused her to become dizzy and be unable to fully process the recordings and retain its content. Furthermore, Plaintiff's hearing loss in her right ear began to intensify (a condition that she had informed DPS of, but that DPS had failed to list as a disability). Additionally, Plaintiff's migraines were also worsened by sound as well and therefore listening to the audio recordings caused her further migraines. As a result of these issues, and without an appropriate replacement for the note-taking services, Plaintiff had to spend an exorbitant amount of time listening to the lectures (most of which were 2-3 hour lectures) and therefore fell significantly behind in the courses. Thus, audio-recording services were clearly not an appropriate alternative to the note-taking services given Plaintiff's individual needs based on her disability. On numerous occasions during this period, Plaintiff explained to then-Disability Specialist, Haydee Lindren, and then-DSP Specialist Supervisor, Constance Chiba, that a recording device was not a suitable alternative to note-taking services and had not been since Fall 2012, when student began needing and was approved for, note-taking as a DSP accommodation.

31. In response, on or about March 13, 2014, DSP attempted to schedule a meeting with Plaintiff in order to "explore other resources and alternatives." Plaintiff was unable to make the proposed meeting dates and times due to many commitments (classes, internship, midterms, and a legislative lobbying program) that conflicted with DSP meeting times offered.

32. On or about April 4, 2015, despite the fact that Plaintiff had previously provided DSP medical documentation to support the need for the note-taking accommodation, DSP demanded that Plaintiff have her physician provide medical documentation demonstrating that she could not learn the class material from an audio recorder. Plaintiff responded that she would try to obtain this medical documentation.

33. On or about April 9, 2014, Plaintiff told DSP that she would attempt to schedule an appointment with her physician in order to provide such documentation. However, Plaintiff pointed out that her courses ended in several weeks and that she would not be able to see her physician until May 2, 2014.

34. On or about April 11, 2014, DSP sent Plaintiff an email stating that, given that Plaintiff had not produced evidence of a hearing or cognitive impairment, if she was asserting that she could only learn via written language she would need to provide medical documentation.

35. On approximately April 16, 2014, about 2 weeks from class ending, Plaintiff was provided class notes. Due to the fact that receiving these notes so late in the semester would fail to allow her to appropriately access the class lectures, Plaintiff again asked her Professor that she receive an "Incomplete for the class" and this request was granted.

36. In response, Plaintiff filed a complaint with The United States Department of Education Office of Civil Rights ("OCR") alleging that Defendant denied her approved and necessary note-taker services and that Defendant discriminated against her on the basis of her disability by denying her continued financial aid for the Spring 2014 semester.

37. On April 3, 2015, OCR filed its report on the case based on its findings. OCR Found Defendant to have been out of compliance with Section 504/Title II and the regulations of 34 C.F.R. §104.44(d), 28 C.F.R. §35.130, and 28 C.F.R. § 35.160 because it failed to engage in an interactive process with Plaintiff to establish an equally effective alternative to the note-taking accommodation and instead unilaterally decided to offer Plaintiff an audio recording device for

her Social Welfare 250 M course during the Fall 2013 semester and for her Public Policy Analysis PP101 course during the Spring 2014 semester. Defendant offered these recording devices despite DPS staff members knowing that an audio recording device did not appropriately accommodate her disabilities, unlike the notice-taking services, and was therefore an inappropriate alternative.[2]

38. Plaintiff continues to work towards her diploma at UC Berkeley by finishing all her classes in which she has grades of "Incomplete." However, because she has taken all her requisite courses, UC Berkeley categorizes her as an "unregistered student." She has had to take out a significant amount of loans in order to be able to do so given that she continues to be denied financial aid. From December 2014 to December 2015, she had to pay the University in order to have access to its libraries.

39. On or around December 2015, the OCR and Defendant reached a settlement agreement on behalf of disabled students at the University receiving services through DSP. As part of the settlement agreement, Plaintiff was able to submit the recordings of her fall 2013 classes that she had taped to Defendant who would then send her transcriptions of these recordings. On March 18, 2015, Defendant sent these transcriptions to Plaintiff. However, Plaintiff has received notes from these classes almost two years after requesting them. Further, not all the lecture recordings were able to be transcribed in contrast to what was agreed to by DSP.

## Count One

**(VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12132 AGAINST DEFENDANTS)**

40. Plaintiff incorporates and realleges the allegations set forth in Paragraphs 1-39 above.

---

[2] OCR found that Defendant was in compliance with Section 504 and Title II in regards to denying financial aid to Plaintiff for the 2014 Spring semester given that the University denied continued financial aid based on Plaintiff's inability to complete several academic conditions. The report specifically stated that OCR made no determination on whether Defendant's failure to provide Plaintiff with notes in her Social Welfare 250 M course necessitated her having to take an "Incomplete" grade in the course.

41. REGENTS is a public entity as an arm of the State of California which receives substantial funding from the United States Federal Government.

42. Plaintiff at all times material to this action, had diagnoses of AIDS, peripheral neuropathy, asthma, Diabetes, chronic pain, arthritis, mobility issues, migraines, diarrhea/nausea, and anxiety/depression which substantially limited her in the major life activities of learning and concentration, among others.

43. Plaintiff was otherwise qualified to receive services from Defendant as she was approved for a myriad of services and accommodations from the school.

44. Here, during the Fall 2013 semester and the Spring 2014 semester, Plaintiff suffered discrimination in violation of the ADA, 42 U.S.C. § 12132 as a result of her disabilities due to Defendant's discrimination, failure to engage in an interactive process, and failure to properly accommodate Plaintiff and her disabilities.

45. Plaintiff's disability accommodation letters for her classes distinctly state that her provided accommodations, including note-taking services, were "needed" and "appropriate" for her. As such, Defendant was required to provide this service for Plaintiff. Additionally, none of Plaintiff's disability accommodation letters mentioned that an audio recording device would be used in lieu of note-taking services.

46. When it became clear that Defendant was unable to secure volunteer note-takers, it decided to offer Plaintiff an audio recording device rather than promptly engage in an interactive process with Plaintiff to identify an effective interim or permanent solution. Defendant merely assumed that an audio recording device would be an effective replacement for all students needing note-taking assistance rather than considering Plaintiff's individualized needs.

47. Defendant, however, knew that audio recorder was an inappropriate alternative to note-taking services, but in response demanded medical documentation and therefore erected further barriers to Plaintiff's education.

48. Then, in the Spring 2014 semester, Defendant declined to provide Plaintiff with continued financial aid given the alleged lack of SAP. Such a determination distinctly ignored the fact that during the Fall 2013 semester, Plaintiff was fully denied note-taking services in Social Welfare 250M and denied note-taking services for a vast majority of Introduction to Public Policy Analysis PP10. Based on the lack of appropriate accommodations, Plaintiff reasonably requested to receive "Incomplete" grades in these classes. As such, but for Plaintiff by denied appropriate accommodations during this semester, she would have been able to take and pass those classes.

49. Defendant denied Plaintiff continued financial aid also because she failed to complete a series of academic conditions that had been conditions of prior exceptions to alleged SAP failures granted to her under circumstances when her prior failures to make SAP were not alleged to be the result of Defendant's failure to provide reasonable accommodations.

50. Such an argument ignores that the fact that in semesters prior to Spring 2014, Plaintiff was provided financial aid despite not meeting the conditions established for her by Defendant. To cite Plaintiff's alleged failures to the meet the conditions as a reason to deny financial aid in the Spring 2014 semester was discriminatory given Defendants established past method of conduct.

51. As outlined above, the exceptions were granted because of the extenuating circumstances that caused Plaintiff further disabilities and necessitated the services of additional time to complete course work. Because of her exposure to noxious chemicals due to the explosion of the Chevron Refinery by the Richmond Bridge, Plaintiff experienced significant health issues including: peripheral neuropathy, asthma, chronic pain, and migraines had to attend a significant amount of medical visits during the fall 2012 semester, causing her to miss a significant portion of classes during this period. Due to her exposure to a Hepatitis A outbreak and a new diagnosis of Diabetes 2 during the spring 2013 semester, Plaintiff again had to attend numerous medical visits which again caused her to miss a significant portion of classes. During the fall 2013, Plaintiff was not provided her mandated note-taking accommodation in order to appropriately complete her

work in her courses and also experienced a cancer scare, causing her to again miss classes due to medical appointments. Thus, these exceptions were granted because these circumstances, in addition her already existing disabilities, caused her to fall so behind in her classes that she was unable to adequately catch-up to her peers and complete them. Therefore, Plaintiff reasonably requested "Incomplete" grades in these classes due to these extenuating circumstances.

52. As a direct and proximate cause of the foregoing discrimination, Plaintiff suffered damages, including embarrassment, humiliation, pain and suffering, emotional distress and discrimination damages. Additionally, Plaintiff has been required to take out student loans to pay to continue to attend school at UC Berkeley. Had Plaintiff received reasonable accommodations she would have graduated and obtained employment. As a result, Plaintiff has suffered lost wages and lost earning capacity. Plaintiff has also incurred the costs of attending UC Berkeley and other economic damages.

## Count Two

**(VIOLATION OF SECTION 504 OF THE REHABILITATION ACT)**

53. Plaintiff incorporates and realleges the allegations set forth in Paragraphs 1-39 above.

54. REGENTS is a public entity as an arm of the State of California which receives substantial funding from the United States Federal Government.

55. Plaintiff was at all times material to this action, had diagnoses of with AIDS, peripheral neuropathy, asthma, Diabetes, chronic pain, arthritis, mobility issues, migraines, diarrhea/nausea, and anxiety/depression which substantially limited her in the major life activities of learning and concentration.

56. Plaintiff was otherwise qualified to receive services from Defendant as she was approved for a myriad of services and accommodations from the school.

57. Here, during the Fall 2013 semester and the Spring 2014 semester, Plaintiff suffered

discrimination in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.* as a result of her disabilities due to Defendant's discrimination, failure to engage in an interactive process, and failure to properly accommodate Plaintiff and her disabilities.

58. As established above, Defendant failed to engage in an interactive process to determine whether audio recording devices were reasonable alternatives to note-taking services and instead purported to offer Plaintiff such a service without properly considering her individual needs based on her disabilities.

59. Additionally, Defendant denied Plaintiff continued financial aid due to alleged lack of SAP despite the fact that this lack of progress was due to its failure to appropriately accommodate Plaintiff, extenuating circumstances that caused Plaintiff further disabilities, and that Defendant had in the past been allowed Plaintiff to continue to receive financial aid despite not having met all of its established conditions for her.

60. As a direct and proximate cause of the foregoing discrimination, Plaintiff suffered damages, including embarrassment, humiliation, pain and suffering, emotional distress and discrimination damages. Additionally, Plaintiff has been required to take out student loans to pay to continue to attend school at UC Berkeley. Had Plaintiff received reasonable accommodations she would have graduated and obtained employment. As a result, Plaintiff has suffered lost wages and lost earning capacity. Plaintiff has also incurred the costs of attending UC Berkeley and other economic damages.

## JURY DEMAND

61. Plaintiff demands a trial by jury on all issues for which a jury trial is afforded by right.

## PRAYER

Plaintiff prays that the Court award damages and provide relief as follows:

1. General and special damages according to proof at trial;

2. Other remedies that this Court deems equitable and appropriate;

3. Reinstatement of Plaintiff;

4. Injunctive relief requiring Defendant to provide reasonable accommodation appropriate for Plaintiff's disabilities;

5. Approval of financial aid for Plaintiff to attend UC Berkeley;

6. Reasonable attorneys' fees and costs pursuant to statute;

7. Any remedies that this Court deems equitable and appropriate.

Dated: **September 14, 2016**　　　　　　　　Respectfully submitted

/s/ Jay T. Jambeck

_____
Jay T. Jambeck
*Attorney for Plaintiff*